Good morning. May it please the Court, my name is Matthew Carvalho and I represent the petitioner, Khalid Al-Himri, in this case. The petitioner is here with us in the courtroom today, as well as my colleague, Rachel Hahn. Thank you. I'm curious about the court because I was told by the clerk that you're an appointed counsel. I'm sorry, no. I'm pro bono counsel, but I'm not appointed. You're a pro bono counsel. Yes. Okay. Yes. All right, good. I plan today, I'd like to reserve two minutes for rebuttal, if possible. I realize we have a very short window of time here, but... Can I have some argument? Ten minutes per side? You want to... If I could have two minutes for rebuttal, that would be great. I plan to address four issues, and I realize this is going to have to happen quickly, so if you'd like me to address them... Fast. Sorry. All right, don't worry. If we have questions, I'll make sure the presiding judge will accommodate everybody. I won't be able to hear you if you rush through this. Great. It's one of the things I struggle with. I'm first going to discuss the adverse credibility finding in this case, because I think this is what has tainted the Board's decision in this case with respect to all of the substantive claims. Here, the Board found that Mr. L. Henry was not credible because it found that there was a discrepancy between the written application documents that he submitted and his later oral testimony. What this refers to is the fact that in Mr. L. Henry's written asylum application, he indicated that he was involved in a student group while living in Kuwait. And later, in his oral testimony, he identified that group by its name, Ali Todd. In the Board's decision, they focus on this, what I would refer to as an amplification of detail, and describe it as a discrepancy that somehow suggests that Mr. L. Henry was seeking to improve his story at oral argument. I would suggest to the Court that this is not even a discrepancy. It's a minor omission. And under this Court's decisions in cases like Aguilar-Ocota and Osorio and Martinez-Sanchez, a minor omission that does not go to the heart of the Petitioner's claim cannot form the basis of an adverse credibility finding. And while the government argues that Ali Todd is the central core of Petitioner's claim, what's really the core of the claim is his political activity. It's the name of the organization is relatively tangential to that. Ginsburg. Doesn't the name of the organization and the identity of the organization carry significance in this case? Burschel. The government argues that it does. And I'm not saying it's insignificant. If you look at the application, he indicates very clearly that I was involved in a student group. And then he goes on to describe what his activist activities were. And the Board's opinion even notes that those activities are consistent with what he testified to orally. I think there's also an explanation in the record for why he didn't identify the group by name in the original written materials. So he didn't want to identify names until the judge persuaded him it was essential. Maybe he was worried about what would happen if he identifies names of the organization and then he's deported or something like that. Is that the gist of it? Yes. I mean, he — what he told the judge, the I.J., through counsel was that he feared that talking about organizations or individuals by name could endanger his family in Kuwait as well as himself. And I think the danger there was that the government was — What was the basis for that at this — you know, at the time of the hearing? Well, the basis for that, I think, is that, you know, if the authorities at issue in Kuwait or Jordan were to find that he was testifying before an American tribunal, that he believes that those governments are persecuting members of this group, even though those authorities may already know that he's a member of the group, I think he has a credible fear of persecution for having called out that foreign government in an American tribunal. I think that's a credible fear. Is that what he explained in the hearing? Not in so many words. And, you know, this was a relatively short exchange on the record, but he did very briefly explain what the ramifications of that would be, and the next opportunity he had to testify was at his hearing, and he then identified names. And I would point out, too, that — There's a problem with that explanation that he gave, and it's created in part by your brief, because your argument is that he didn't earlier identify the name of the student organization, Alitad, because he was afraid of the implications for his family if the Jordanian government were aware of his association with Alitad. Yet in your brief, at page 12, you say that under torture, Musab and Amad identified Petitioner and indicated that their role in the Yarmouk demonstration had been planned at a June 1985 Alitad meeting in Kuwait, which seems to indicate that Jordanian officials were aware of Petitioner's involvement in Alitad as of 1985. That's true, Your Honor. But there's also — it's also important, I think, to distinguish what the Jordanian authorities may have known with what the Kuwaiti authorities might know. His statement in his testimony — this is a clear conflict between what he said in his testimony before the IJ, which was he was afraid to — to put the name Alitad in his asylum papers because he didn't want Jordanian officials to find out about that association. I think — and I'll double-check this, Your Honor — but I think in the record, his lawyer indicates to the IJ that he's afraid for his family in Kuwait. Well, if that's the case, your brief also says that in 1989, Kuwait began to deport Palestinian residents who were members of Alitad or had collaborated with the PLO, so he became concerned that he could be deported. I don't believe that Kuwait knew he was associated with Alitad. Your Honor, I think it's — it's not that he was afraid that Kuwait would learn that he was a member of Alitad, because — That's what he — well, your — what he said is something different than what you're saying now. No, I need you to address a legal point when you've — I don't want to cut off your response on Judge Kavanaugh's question, but I was going to ask — in my mind, at least, I was going to ask both the government and you, and that is that normally — I guess we don't get to — we can't reverse one of these decisions by the BIA unless we're prepared to say that the evidence — not just that we think we would have decided differently, but that the evidence compels the conclusion the other way. Now, how does that apply? How does that principle apply? Does it apply on a credibility determination? So, in other words, here, if the board said, well, we think there's an inconsistency, you didn't mention Alitad, and then on the other end, you say, well, you know, he said I was in a student organization that did these activist things, and it's not that important. Do we have to come to the conclusion that the evidence compels the conclusion that they can't make a credibility finding on that, or for credibility findings, is there a different standard? You know, like in the Social Security, an I.J. has to give substantial and cogent reasons to disbelieve someone about their medical condition. So what exactly is the legal standard that governs a credibility determination? Well, Your Honor, the substantial evidence test has been construed as to other aspects of these decisions by this Court's decisions as needing to show that the evidence compels a decision the other direction. I don't know, Your Honor, that there's a decision clarifying that that's also the case in the adverse credibility context. I think you can't find anything right on point. I couldn't. I don't know that there is a case. I would suggest, though, that when the Court suggests that the board needs to state specific, detailed, cogent findings with respect to an adverse credibility finding, that sets a somewhat different bar for a credibility finding than the standard that the evidence must compel a reasonable decision to come in. Well, what do you advocate? If we were to try to refine and articulate a standard precisely governing a credibility determination, what's your client's position and your advocacy as to what that standard should be? I think that a somewhat less rigorous standard is appropriate in the credibility context because credibility is such a sort of loose and discretionary matter. I think that the Court's current articulation of the need to express specific, detailed, cogent reasons for disbelieving a Petitioner is already a somewhat lesser standard than the characterization of evidence needing to compel a reasonable decision-maker to reach the opposite conclusion. But we have standards that we've articulated that the immigration judge and the BIA must follow in order to have their adverse credibility determination sustained by us. Right. And that's the specific, cogent, and legitimate reasons, and it must go to the inconsistencies and go to the heart of the claim. But that's what the BIA found here. Well, I disagree, Your Honor, because I wanted to come back and address this as a follow-up to your other question. You know, regardless of the explanation and whether you buy his explanation for why he hadn't named names, we're still talking about simply the name of the group when the activities described that he engaged in as a member of that group were consistently testified to throughout from beginning to end. And so, you know, I think that this Court's authority holds that inconsistencies that are minor can't form the basis of the argument. Well, that's what the dispute's all about, whether it was minor or not. But let me ask you another question. Assuming we would agree with you on the credibility determination, what is it that you want us to do? I think that once you credit Mr. L. Henry's testimony, there is, he states, the record shows a clear probability of persecution in Jordan at most and at least a subjectively and objectively reasonable fear of persecution in Jordan. Therefore, I believe he's entitled to withholding of deportation from Jordan as well as asylum from Jordan. You ask us to go further and find, not to just send it back, but to go further. Are we able to do that under United States v. Ventura? In our case called Chan? I think that the evidence is voluminous enough, as you know, in this case. Voluminous. That's for sure. That crediting the testimony. I mean, given that the adverse credibility finding rests on this one thing, and given that if that is error, that there's nothing to contradict Mr. L. Henry's credibility in the record, that, you know, under this Court's precedent. But there are some comments, especially about the past persecution. You know, he's being deported to Jordan, right? Right. So what we're supposed to look at in our analysis is evidence of his well-founded objective fear of persecution if he were to return to Jordan. That's one aspect of this claim. Okay. What's the other part? The other, I would submit to the Court that he also has a past persecution claim from Kuwait. Now, the Board did not decide that issue. Pardon me? The Board did not decide that issue. Well, exactly. And this is one of the biggest problems with the Board's decision, is that Mr. L. Henry appealed the IJ's finding that he was Jordanian and his IJ's denial of his past persecution claim with respect to Kuwait. And the Board said, we don't need to decide that because the government's seeking to deport him to Jordan, and so Kuwait's irrelevant. I think that's the point. According to your brief, Kuwait is not irrelevant. Exactly. And I think this was an error in the Board's decision. And so if we were to agree with you on credibility, shouldn't we send it back to the Board to look at past persecutions arising out of activities in Kuwait? I think that would be fully appropriate. I also think, though, that the Board's claim that he was Jordanian and his IJ's denial of his past persecution claim with respect to Kuwait is an error in the Board's decision. Didn't he say that he was beaten and or he was threatened in Kuwait because of these Al-Attad activities? Yes. And that's why I. Everything really hinges on the credibility determination. Exactly. And I think that once you credit his testimony, his testimony regarding what happened to him in Kuwait is so consistent and extensive and shows such a clear case of persecution. See, the government. I know because I've had issues with this. The government still has the chance to come back and say that there are changed country conditions since the time that these incidences came. Right? Well. I'm just mindful that there that of the limits of our role here. True. I think one important thing to that's, of course, a risk. And that might suggest that it ought to be sent back to the agency for a determination on that. But. That was in your client's interest. Exactly. But you're concerned. But. But the one thing I would say is that because there's evidence in the record that the Kuwaiti authorities and the Jordanian authorities share information, I would argue that everything that happened to him in Kuwait is very closely tied to. Well, you know, this is. Directions as we know. The case has gone on so long. It is hard to say what evidence that's in the record. At the hearing. He has a very voluminous transcript. Did the INS attorney present evidence on changed country conditions at that time? At the time of the. At the time of the hearing. I don't believe that it's submitted as such. The I.J. found it in his written decision. He found that. And it was. Was there evidence presented? Not. It wasn't. No. I don't believe that. I don't believe the record supports changed country conditions as described in the I.J.'s decision. In which. In which country? In Kuwait. And one of the. One of the most important reasons for that, Your Honor, is that since the Gulf War, Palestinian refugees from Kuwait are simply not allowed to return. And that in and of itself I think is evidence of persecution. To Kuwait? To Kuwait. The population of Palestinians in Kuwait has gone from something like 400,000 to less than 10, because Palestinians have been expelled from Kuwait and not allowed to return. So if to the extent country conditions have changed in Kuwait, they've changed much for the worse. One more question on that. In his original application, he sought asylum only from Jordan. He didn't seek asylum from Kuwait. Well, I think that was because he understood that he wasn't going to be permitted to return to Kuwait. And so he, in his mind, that not understanding what the standards for asylum are, he, knowing that the Kuwaiti government wouldn't take him back, viewed it necessary to establish asylum from the other countries to which the government might deport him, which I think he also listed Israel. I'm sorry. That was in 1993, though. In 1993. Right. The Gulf War, I mean, I think after 1991. Since 1991, Palestinians have been unable to return to Kuwait. All right. Well, we have another question. Could I have one final question? I thought we would have to go over on this. You've devoted on the credibility determination, I think appropriately, time to what the BIA stressed, the naming or not naming of Al-Attab in his application. But there were some other issues. I thought there was an issue about dishonesty in immigration matters. What I want to know is, is it relevant under our precedent, is there any relevance to the fact that he came into the U.S. under a false or fraudulent passport, or fake or false Jordanian papers, rather than coming in legitimately on a visa and then overstaying a visa? I understand the question. I would submit no, and the reason is that the very reason that the Court does not want to permit the Board to look at lack of candor in immigration proceedings as a basis for adverse credibility findings is because the interests that refugees have in getting to safety. Going to lie to get there. Right. And, you know, particularly in the cases of stateless refugees, they sometimes have to travel on, you know, fraudulently obtained documents. There's simply no place for them to go otherwise. Okay. I guess along those lines, I was troubled by the sort of – it's unclear to me whether the BIA actually decided he was a Jordanian national or not. They did not. They did not. And that's – that's another point I wanted to make. They look at his evidence and the counsel from the United States Embassy's representation, but then they say even assuming he's not a citizen, he may still be deported there. May he be deported elsewhere? You know, I think – and this is what led to the Board's misapprehension of the issue. The Government has the authority to deport people anywhere, really. And so the Board viewed this simply as a matter of what country authorizes it. As long as there's another government willing to take them. Willing to take them. And so the Board viewed this simply as an issue of what country ought to be designated for deportation and whether that designation was appropriate. That misses the point because, as the Government's brief points out, sometimes, you know, whether past persecution entitles a refugee to persecution depends on the definition of refugee in the INA, which – in which case his country of last habitual residence, if he's a stateless refugee, is the relevant country for analysis. Do you challenge the Board's suspension of deportation argument? No. I think the Government's analysis of that was correct. I would like to address voluntary departure, if I might, though, because – and this in some ways is similar to the situation faced by Mr. Cardenas in that Petitioner has five children, four of whom are U.S. citizens, and if he is denied voluntary departure and is deported from the country, he can't return here for 10 years. He – the Board based its finding that he was ineligible for voluntary departure on the fact that he had supposedly been dishonest in his testimony before the IJ. I think based on what I've discussed earlier, that's not true. But like the other case – Is that dishonesty on the student organization or dishonesty about this incident at the border? It's – I think what they're referring to, both the IJ and the Board, is his perceived dishonesty in this proceeding before the IJ, because the IJ said, I've noted that he has been less than truthful before this Court, and therefore he falls under one of the per se exclusions for good moral character. All right. Thank you very much. Thank you. Alice Niger from the Department of Justice, representing the Attorney General. I'd like to first address the question of the standard of review. I think this Court has made clear that the – that the same standard that applies, the substantial evidence standard, you know, the Petitioner has to show that there were – Applies to credibility. Applies to credibility. There are several cases. I mean, I'd like to – they're mentioned in my brief on page 27, but in particular, Beratin Melendez and Leon Barrios both say that. And so that is the standard that this Court has to apply. And the Petitioner in this case has to show that on this record, that any reasonable person would have been compelled to have believed him. I need to – and the second issue is a question of what would happen if the Board were to reverse this credibility finding. And I think that, Judge Wardlaw, your emphasis of Einitz v. Ventura is correct. There was no merits determination made by either the I.J. or the Board here. And therefore, there was no determination about whether – if this evidence was credible, whether it was sufficient. So the Board's decision is they upheld the credibility – adverse credibility determination and just denied. Yes. That's how we read the evidence. They discounted all his testimonies. They discounted all of his testimonies. And therefore, there's not enough – there's nothing enough in the record, essentially, to support the claims that they just denied. Right. So the Board would have to make that determination about whether – if all of that testimony were credible and the evidence were credible, whether it's sufficient. Now, getting to that point, I think that something needs to be clarified here. And, Judge Wardlaw, you focused on this. This Petitioner in this case sought asylum from Jordan only. He did not seek asylum from Kuwait. He has only been ordered deported to Jordan. He has not been ordered deported to Kuwait. Is he correct that he could never go back to Kuwait? Is he correct? Would Kuwait take him back? Would Kuwait take him back? You know, I don't know the answer to that. You represent the INS. But that's – but, Your Honor, on this record, I mean, the focus is he wasn't ordered deported back there. What is he supposed to do? If Kuwait's not going to take him back? He's a citizen of Jordan. And, in fact, he has not – he did not challenge that determination. Let me ask you this. Is it your position that everything that he alleges that happened to him in Kuwait is irrelevant to his claim for deport – for his claim for asylum, not to be – not to return to Jordan? It's not irrelevant. But, in fact, he concedes in his brief that he was not persecuted in the past in Jordan. And so questions of past persecution as far as raising a presumption of a well-founded fear of persecution in Jordan do not apply. But his testimony about what happened to him in Kuwait regarding past persecution, is that at all relevant to his claim for asylum from Jordan? In other words, if he suffered persecution in Kuwait, could that raise a presumption? Could he still get the presumption regarding Jordan? No, he would not. He does not get the presumption, because there's – because the presumption is raised by the past persecution of the government to – in the country to which he would be returned. And here, there's absolutely – I mean, he concedes. He hasn't been in Jordan since he was a – he was a child. At page 15, he says, Third, without a basis to doubt Petitioner's credibility, the unrebutted evidence in the record establishes that Petitioner has a well-founded fear of persecution if deported to Jordan. He – that's what he alleges. I agree that he alleges that. And I'd like to focus on that, because I'd like to focus on what – what he offered to prove that. Because there was no presumption raised, he had to prove that he had a subjectively genuine fear and that it was objectively reasonable. And when you distill – there's 3, 4, 5,000 pages of evidence here. But when you distill this all down, his – the evidence that he claims supports his well-founded fear of future persecution is basically three things. One, that in 1984, his father was stopped going into Jordan and was questioned about his activities with Al-Athad. In 1986 or 87, I'm not sure. In the father's activities? No, the son's activity. The Petitioner's activity. Petitioner's activity. That in 1986 or 1987, his grandfather was stopped at the border going into Jordan and questioned about his activities with Al-Athad. Al-Athad. And that in 1987, he was involved in the Yom Kippur University uprising. When you look at what the Board considered as far as the credibility of those findings, this is not just a question of them saying a mere omission of the name Al-Athad. What they were saying – what the Board said is that because we are only considering his persecution, claim of persecution in Jordan, his entire claim rests on his association with this group. And the fact is that he wants to have it both ways. He wants to say that in 1984 and in 1987, the Jordanian authorities said to his relatives, your son is a member of Al-Athad and we want to know where he is. And yet he was afraid to put that not only into his written application. It did not appear in his declaration. It did not appear in his suspension of deportation claim. And it didn't appear in his brief prior to his merits hearing. And what the Board said was it's – the Board considered his explanation of that omission and they rejected it. And what this Court has to find is that his argument is it's so compelling on this record that his evidence and his explanation that no reasonable person could have rejected it. The Board said it just doesn't make any sense. If he is saying I can't return to Jordan because as early as 1984, Jordanian authorities knew about him and his connection to this particular organization, why wouldn't he say it? And in regards to Yarmouth University – I'm sorry? His asylum application, didn't he say that he was in an activist student organization? Well, what's very interesting is there are – Oh. Well, there are other discrepancies, Your Honor, that the Board points out. In fact, the Board says – Could you answer my question first? In his asylum application, didn't he say that he was in a student organization that engaged in activist conduct for Palestinian rights? Yes. Yes, he did. But the Board also said that when he – when asked whether he was engaged in any particular organization after his high school activities, very much of which his claim to Jordan hinges on, he said no. It was only later in his testimony that he claimed that his – that his activities with Al-Ithad went on beyond his high school activities, because the record is clear in 1982 the Petitioner came to the United States and he even testified that his activities after that time, that he maintained some contact, but that his activities were far reduced. And what the Board said was he didn't make that claim in his written application. The Board also said – found a discrepancy between what was a major factor in his claim of a well-founded fear of persecution in Jordan was his participation in the Yarmouk University uprising. In his application, he wrote that two students, friends of his who were arrested there, gave him up because he wasn't there. But – and he suggests very clearly in his application, but that he had no involvement. They just named him because they were on the spot. Wait a second. Wait. Hold it. Wait. You just said that in his application he said clearly that he had no involvement. I've read that application. I don't see where he says it. So show me. I said that he suggests. I didn't say he said clearly, Your Honor. Where did he suggest? He suggests in the fact that when he writes, he doesn't – what he writes is – Clearly, he doesn't suggest it at all. It's the syntax of his sentence that the Board thinks is creating an implication. Yes. And, Your Honor, it's up to this Petitioner. And this Petitioner had six years. Where does he suggest it, though? You said he suggested it. He suggests in the fact that his – the evidence rests – he makes the claim that there were two students that were friends of his that were arrested at the uprising. He at the time was in the United States. This occurs in 1987. He returned to Kuwait in 1987, and that two friends of his were arrested and that they – and that they claimed that it was his involvement. But he doesn't say that, and yes, I did. He makes absolutely no claim of responsibility for that. Later on in his testimony, he says, well, yes, I actually was involved. And the Board thought that that was significant. But he doesn't in his application say I didn't have responsibility for it. He says my friend – in his affidavit, he says three of my friends during interrogation told the police that I had urged them to strike at Yarokmok and that I supported the strike. And he also says in his application something – I don't remember the exact words. You probably have it handy, but it's something like because my friends were tortured, they said that I urged them to do this. He doesn't deny that he did it. He doesn't affirmatively say he instigated it. But it's certainly consistent with his other statements in his application that he was involved in activities for Palestinian rights. I'm not arguing that he wasn't involved in activities for Palestinian rights. What the Board said was that they found that his last-minute naming of this organization made no sense and that it was a significant omission because his entire application rested on – It's useful language in his affidavit at page 12, lines 22 and 23. It says each of my friends was threatened with death by the guards. Because they were very afraid and to save their lives, each informed the Mukhabarat that I had directed them to protest and that I had supported and advocated the movement from Kuwait. So, I mean, why does that language – why do you argue that that language suggests that he's denying that he was involved? I'm arguing that that language led the Board to conclude that his later taking responsibility for it was inconsistent. Why would he not have said in his application, and I was responsible? And what this Court has defined is that it was so compelling that you would have to have believed him. And I'd also like to point out that at the time that he claims that the Jordanian government was looking for him, pretty much because of this Yarmouk University uprising, which was in 1987, in 1989, two years later, they renewed his application for a five-year passport. Right after he says this language about his friends saying that he was instigated or was involved in the planning of this protest that became violent at the university, that he also says that the Jordanian authorities, you know, they were very interested in me because of my activities,  And that would be al-Ittad, which he never mentioned in his application. But he said he was in a student organization. He just didn't say it by name. Why isn't it the activities that are at the crux of what the Board should be looking at as to whether or not he has a fear? Because the activities, because even he's not very clear. When you read his testimony in his application, his activities all took place in Kuwait prior, and almost all prior to 1982 when he was a high school student. They pretty much amount to having put together one student newspaper supporting an independent Palestinian state, which, and I see I'm way over my time, and I really don't want to. I'll give you time because I've given the other side more time. Okay. So his entire claim of his well-founded fear of going back to Jordan is based pretty much on pre-1982 activities with al-Ittad. He came to the United States. He came to the United States in 1982. But during the Yarmouk uprising, he was in the United States. Well, it was very interesting. Even though he claims a well-founded fear of persecution in Kuwait, he went back in 1985 to get married. He went back in 1987 and stayed until 1989. He came back to the United States for two months, and he went back to Kuwait for nine months and returned to the United States in 1990. So it's he has been going in and out of Kuwait since 1990. And while he may not, he may have a concern after 1990, after the first Gulf War, of returning to Kuwait, the United States is not sending him to Kuwait. And the reason that this is important for his Jordanian application is because none of these activities took place in Jordan. They all took place in Kuwait. And yet, even after that, he traveled back and forth and in and out of Kuwait, and he spent long periods of time in Kuwait without he said he had some problems where he was detained, he was required to report to the police station. But that does not appear to be any different than it's a repressive society. We agree to that. And they have very different rules in the United States. But the fact is that he felt safe enough in 1985 to go back and get married in 1987, to go back, spend two years, and to build a business with his brother and to come back to him. I'm talking about Kuwait. I'm talking about Kuwait. He's griping about being sent to Jordan right now, right? Exactly. But his entire claim for going to Jordan rests on the activity and his supposed past persecution in Kuwait. Not entire. I mean, you're saying his entire claim, but part of it relates to his statement that the Jordanian authorities were interested in him because of his student activities. Yes. And because his two friends said that he instigated this uprising. That's part of his claim. Let me ask you another question. Your Honor, before you go on, what I'd like to point out, though, is that he claims that the Jordanian government is interested in him because of this 1987 incident. But in 1989, the Jordanian government gave him a new five-year passport. And Mr. El-Hemry himself, on page 778 of this record, talked about not being able to get a Jordanian passport for his United States citizen's son. And when he was questioned at length about that, it was clear the reason that he was trying to get a Jordanian passport for his son was because he was contemplating a trip to Jordan. None of this fits with somebody who is afraid after 1987 because of his participation in this Yarmouk University uprising. None of this fits with somebody having a well-founded fear. So I think that what you need to do is look. It's not just a question of him having omitted. You know, and I have to admit, when I picked up the Petitioner's brief before looking at the record, I thought, wow, how could that be a significant omission, just the name of something? And I had the same reaction. But when I read the record and I put the pieces together, it's not just a question of the omission of this name. It is a question about how all of these things link together and how this Petitioner in trying to make a claim in two countries had to make inconsistent statements and inconsistent claims. Kennedy. I have another question I'd appreciate it if you could address. And by the way, I think that all three judges on the panel have spent a lot of time with this case and a lot of time reading the record. So don't feel that you're alone in looking at the record. Oh, I wasn't suggesting that you are. Here's my question. If the BIA, and I'm focusing on what the BIA gave as their primary ground for disbelief in Mr. El-Hemry, that he didn't mention the name Alletad in his application. If the BIA thought that a real association with Alletad would have helped his chances of getting asylum, then wouldn't, if he was fabricating it, wouldn't it have been likely that he would have mentioned it at the start? I mean, he said he was in a — his story is, I said I was in a student organization. I didn't give the name. I didn't want to name names. During the hearing, the IJ impresses on him that he has to name names, so he names it. But, I mean, if he's just coming up with the name Alletad to phony up an excuse for asylum, wouldn't he have been likely to put it in the application at the start? Not necessarily, Your Honor. When something goes on over six years and you're questioned by what, in this case, was a very able trial attorney, INS trial attorney, and you start to see the writing on the wall, you start to make your case better. And I think that's what the Board recognized, is that over a period of time, this Petitioner just made his case better. Why did this Petitioner go on for six years? OST was 1993, and here we are almost at the end of 2003. This thing's been going on for 10 years. I don't think that this was, I mean, you know, in a lot of situations it's government, you know, delay. But in this case, this was a question of there being a tremendous amount of testimony. I mean, there's 1,700 pages, I think, just of the hearing alone, and there was a lot of other evidence, which is something that I really would like to get to before I conclude. Are we allowed to discuss that other evidence with you? I'm talking about record evidence. There was a question about whether there was any evidence, whether the government put in any evidence of changed country conditions. You did, Justice Breyer. And there is a tremendous amount of evidence in this record, not of changed country conditions, but of the fact that Jordan supports and supported at the time an independent Palestinian State. This gentleman said that he belonged to an organization that was committed to furthering an independent Palestinian State by nonviolent means. And there is just a huge amount of evidence that is all cited in the government's brief to the board talking about Jordan's position on that. They even support people who support Hamas, which is a violent organization, that there is just the Bureau of Human Rights and Humanitarian Affairs said in a report that's part of the record, We have not received a single report that a Palestinian returnees are being mistreated in any way by the Jordanian government at any level. There are pages of evidence rebutting any presumption of a well-founded fear of persecution in Jordan for any reason by a Palestinian. And so, therefore, I just wanted to go back. So the board didn't address that. The board didn't address that. But that goes to the question of what would happen if this Court did reverse the adverse credibility decision. Isn't there evidence that he had an uncle who was an activist in the Fatah, that the Jordanian officials were concerned about his uncle? I mean, might he not be in a different position than the run-of-the-mill Palestinian? Well, that was another basis for the board discounting his credibility, however, because they said that that was one of the reasons that he claimed his And that the petitioner claimed that his father and grandfather were in question about Uncle Fahad's activities. But the board said other than making a claim that he was part of the Black September group, El Fatah I think was the other name for it, and other than claiming that he disappeared and they believed that he was dead, that there was absolutely no evidence in this to justify the Jordanian government looking at him 25 years  ago. And so the board said, where did the Board of Immigration Appeals say that they were making the negative determination in part because he had no evidence about this uncle? Well, on page 8 of the board's decision, I'm sorry, I don't have the record reference, but on the board's page 8, there is a credibility B subheading, and under that there are subheadings 1 and part 2 of that is testimony regarding Respondent's uncle. So it's clearly part of the credibility determination. And what did it say exactly about the uncle that you think shows that they discounted his credibility in that regard? Because the third paragraph, it says we find the Respondent's testimony consistent in this regard. However, the Respondent's testimony about the Jordanian government's interest in his uncle and his uncle's interest in his uncle, I'm sorry, that's on page 10. It's in the final paragraph of that subsection. The final paragraph, the however paragraph? Yes. Appears to be at best an exaggeration of the truth. I would say that that, I mean, considering they put it in the credibility determination and they call it an exaggeration of the truth, I would suggest that that's pretty clear that they are questioning the credibility of his claim. We question the Respondent's story about the authority's interest in his family, so they are clearly questioning that. And so that is another basis for them having discounted, because in fact, I mean, those are the two bases that his claim of a well-founded firm of persecution in Jordan rests on. What are the bases that, just in bullet point form, that you contend are the bases for the credibility determination? The not mentioning the name Alitad is one. And now you're saying that. Right. But the significance of the name to his claim, his exaggeration about his uncle's testimony, I think that you can also, as part of the record, consider the fact that he did get a passport on three separate occasions from Jordan, that he sought a passport for his son after the last incident that he claims was a basis for his well-founded firm. The Board does not, but are we limited if we're assessing whether they've given adequate reasons or substantial reasons for credibility determination, aren't we limited to what they said in this opinion that we've, you and I are both looking at? Well, the standard of review says whether there is substantial support in the record. It doesn't say whether they name specific and cogent reasons. And the specific ones are required when they make an adverse credibility determination that they give specific and cogent reasons for that. Well. So if you're telling us that one of the reasons is his recent attempts to get passports to return to Jordan is a basis for their adverse credibility determination. They do. I don't see how we could, you know, that's not a basis for the Board's decision. They do talk about his return to Kuwait, his numerous trips to Kuwait. We're just talking about Jordan a minute ago. Well, I guess you could remand to the Board to have them specifically lay it out. But I think that there are cases that say, when it's obvious on the record, the fact that they perhaps didn't specifically point to it, but that it supports the adverse credibility determination, that this Court can take it into account. Because, in fact, you look at the record as a whole when looking to see what happens. Well, I don't, you know, I'm not going to broil you on that. It's just our case law is very clear that when there's an adverse credibility determination, the Board has to give specific and cogent reasons that are supported by substantial evidence to provide the basis for their determination. But what I submit to you, Judge, is that the Board did give specific and cogent reasons and added to that. Breyer, in your argument, you just added another reason that I was – that I had not factored in. But I think – I'm suggesting, though, that what this Board has said are specific and cogent reasons that are supported by substantial evidence. But I think that in considering whether he exaggerated about his uncle and his return – his ability to return, that you can look at evidence supporting – because what the Board says, we don't see evidence of them being interested in his family. And I think this Court can say there's substantial evidence in the record supporting that determination, the fact that they all got passports and that he still had passports for his son. I think that's evidence supporting the Board's reason, that being that they're not interested in his family. I don't think it's completely separate. Regarding his uncle, how old was he at the time that his uncle was involved in the black market? His uncle was – disappeared in 1970, and this Petitioner was born in 1967, so he was 3 years old. That's not to say that a family relationship couldn't necessarily exceed the bounds of age where they might go. I think that that's certainly possible. But I think what this record shows is that they're just – I think what the Board said is there's no – there might have been a basis, but there's no basis in this record for understanding why Jordan, 30 years after or at the time of the hearing, 25 years after this uncle's disappearance where there's no discussion of anything later, why they would hold – continue to hold that against the family members, particularly having given them passports. What's your response on the Catt claim? You don't have a response on the Catt claim? Well, the problem – the problem with his Catt claim is that it all hinges on the evidence that supports his asylum claim. And if, in fact, his asylum claim is not credible, then there's no credible evidence of his Catt claim. Our case law says that even if there is an adverse credibility finding on the asylum claim, the Catt claim is different, raises different concerns. I realize. But in this case, the problem is that this Petitioner hasn't shown any past – he hasn't even shown past persecution. Catt's about future. That's right.  But I think our – I think our argument that there's no credible – However is in the record you're saying, especially given the – okay. And what about the – Can I just – can I just answer that for a second? No, counsel. You are almost 20 minutes over your time. That's really – just one last question. Why do we not have jurisdiction to review the voluntary departure? This case arose under the transitional rules. And 309c4e precludes any review by the court of discretionary decisions. This wasn't discretionary. They determined that he was statutorily ineligible. Well, again, just as I pointed out in the last case, yes, there was a statutory eligibility question. But the board in this case said, additionally, we agree that the Respondent's lack of candor during his testimony also provides a reason. They don't say discretion. But I suggest that that is a discretionary basis. And as far as the good moral character, there are cases that say that that is a determination that is in the Attorney General's discretion. And so, therefore, if it's a question, even if the lack of candor is not toward the discretionary prong of determination, it goes to his good moral character, then I would suggest that that being a discretionary determination, that is also a mutual review. What if we disagree with you on the credibility determination? Then you would have to send this case back. Even on the voluntary departure, correct? They would just have to look at a new. Well, if you would disagree with it, you can't review the discretionary determination. You would have to review the eligibility requirements, because 309c4e is very clear about no review of a discretionary determination under 244, which is the predecessor to 248. If we disagreed on the credibility determination, we would just vacate. We would just remand, basically. You would remand. Yes, that's correct. And then he could probably request voluntary departure, because his case would be reopened and he wouldn't have a final deportation order. Right. So then he would have the opportunity to ask for a voluntary departure again. Okay. Thank you. Thank you. All right. The case of Elhingray v. Ashcroft is submitted. And we will proceed to United States v. DRL.
judges: Wardlaw, Gould, Paez